## WILLIAMS v JUDD

Ohio Appeals, 1st Dist, Butler Co

No 705.    Decided Oct 26, 1936

Maxwell Finkleman, Cincinnati, and Harry S. Wonnell, Hamilton, for appellee.
John D. Andrews, Hamilton, for appellant.

## OPINION

By MATTHEWS, J.

This is an appeal on questions of law from a judgment rendered in favor of the plaintiff in the trial court by the Court of Common Pleas of Butler County.

The case involves the determination of responsibility for a collision in a public street intersection between two automobiles. The plaintiff in the trial court—the appellee in this court—operated one of them at the time and the defendant in the trial court, who is the appellant in this court, operated the other.

The appellee was proceeding northwardly on Jackson Street and the appellant was proceeding westwardly on Superior Street, both in the city of Middletown, Ohio. Each was on the right side of the street upon which he was proceeding and the automobiles came into collision in the northeast quarter of the intersection of those streets. These facts are admitted.

Each in his pleading charged the other with negligently causing the collision.

The appellee's testimony on the subject of the collision, so far as material, is as follows:

"Q. When you got near to Superior you say you slowed down to how fast?

A. About ten miles an hour.

Q. When you got there to that intersection or before you proceeded to cross it, you may state whether you looked.

Defendant objects. Overruled.

Defendant excepts.

A. Yes, I looked both ways.

Q. Did you see any automobiles approaching that intersection?

A. No sir, not approaching it; I saw one east of it, about 150 or 200 feet away.

Q. East of there?

A. Yes sir.

Q. Which way was that from the way you were, right or left?

A. Right.

Q. How far away did you see the automobile at that time?

A. About 150 or 200 feet away.

Q. Where was it with reference to that alley that comes out between the blocks east of Stanley?

A. Right at the end of that alley.

Q. Just tell the court and jury about where you were when you saw that automobile to your right about 150 or 200 feet.

A. About 4 or 5 feet from the intersection.

Q. What did you do then?

A. I just went on across.

Q. When you started across that intersection, about how fast were you going?

A. About ten miles an hour.

Q. How far across did you go?

A. I got across the intersection, on the north side of the intersection.

Q. What side of Stanley Street were you on?

A. I was running on my right side, going north.

Q. Yes. Now you may state whether or not there is any grade there.

A. Any grade—when you come down Superior you come down hill.

Q. How about Stanley Street going in the direction you were going?

A. Not so much of a grade.

Q. Just a little uphill?

A. Yes sir, just a little uphill.

Q. Now just tell us what happened as you got to this intersection, slowed down to about ten miles an hour and saw this machine to your left as you have stated, and started across. Just tell what happened.

A. Started across and got almost across and he hit me on the right side at the door.

Q. Who hit you?

A. This man in the car there.

Q. Mr. Judd?

A. Mr. Judd.

Q. Do you know what kind of a machine he was driving?

A. No, I don't know what kind of a machine he was driving.

Q. Just about where was your machine when he struck you?

A. The front part of my machine was almost at the curb, to the sidewalk going across.

Q. You mean a line where the street walk would go across?

A. Yes sir.

Q. You may state whether or not the front end of your machine had reached a line on Stanley drawn straight across the north sidewalk of Superior.

A. Just about reached there.

Q. What part of your machine did Judd strike with his machine?

A. The right front door.

Q. While you were crossing the street, state whether or not you saw Mr. Judd coming toward you.

A. Yes sir, I saw him.

Q. And after you had gotten out into the intersection.

A. Yes sir.

Q. Now how fast would you say Judd was going?

A. Well I would say about 45 or 50 miles an hour.

Q. What happened then?

A. He ran into me."

On the subject of damage to his automobile he said:

"Q. Just tell the jury how it was broken.

A. Right door was torn off and wheels were torn down and chassis all bent up.

Q. Was the front windows or front part of it damaged?

A. Not very much; got damaged a little bit in turning over.

Q. Just tell us how it was damaged.

A. The right door was knocked in on it; the wheels all bent; the axles were broke; busted the tires all up; top was all caved in.

Q. Tell us whether or not the housing was broke and engine.

A. The housing was broke and chassis was all bent up too."

On cross-examination, he said:

"Q. You saw Mr. Judd or the Judd car coming down there, didn't you?

A. Yes sir.

Q. You saw it coming west on Superior?

A. East on Superior.

Q. West, wasn't it going?

A. Yes sir.

Q. You saw it east of Stanley, coming west on Superior?

A. Yes sir.

Q. You saw it coming 45 or 50?

A. I couldn't say how fast he was coming.

Q. You saw it coming fast, didn't you?

A. Saw the lights of it coming.

Q. When was it you determined it was going 45 or 50 miles an hour?

A. When he hit me; he hit we like he was going that fast.

Q. Then you don't know how fast he was going, do you?

A. I figured if he was coming at a moderate rate I had plenty of time.

Q. Did you observe his car to tell how fast he was coming?

A. No sir.

Q. Even though you saw it coming, you went out on that intersection?

A. Yes sir.

* * *

Q. Then after you started to go across the intersection, didn't you speed up?

A. No sir, I cross it about ten miles an hour.

Q. You are sure of that, are you?

A. Yes sir.

Q. * * *

Q. Now did you watch the Judd car after you say you looked there and saw him coming up by that alley, did you look at it any more?

A. Yes sir.

Q. You kept watching it, did you?

A. I didn't keep watching it.

Q. When did you look at it again?

A. When I looked at it again he was right on me.

* * *

Q. When you saw him ten or fifteen feet away from you and you were on the intersection, didn't you make any effort then to turn?

A. No sir.

Q. Did you know how fast he was going then?

A. No sir, I didn't know.

Q. Well you realized he was going to hit you, didn't you?

A. I didn't at the time, thought probably he was going to stop."

The evidence shows that after the collision both automobiles came to rest near the northwest corner of the intersection. The plaintiff's automobile was in the adjoining yard right near the street line and the defendant's in Superior Street, west of Jackson, against the curb. The two were not more than twelve feet apart.

The vehicular part of Superior Street was thirty-six feet wide and that of Jackson Street thirty feet. In addition, both streets have sidewalks with a strip of grass between the sidewalk of a total width of about twelve feet.

The accident occurred on January 18th, 1935, at about 7:15 P. M. It was dark, but there were street lights.

With the exception of an automobile which was following that of appellant there was no other traffic—vehicular or pedestrian—in either Superior or Jackson Street, in or near their intersection.

The appellant and his corroborating wit-

453

nesses testified that he approached and entered the intersection at a speed between twenty and twenty-five miles per hour, and that the plaintiff entered the intersection after he did and at a much greater speed and ran against the left side of his automobile, and that the appellant did not know that the appellee had not yielded or did not intend to yield the right of way until both were in the northeast quarter of the intersection and so close together that the collision was unavoidable. Their testimony tended to prove the appellant was without fault and that the collision was caused through the appellee's negligence in not yielding the right of way.

It can be seen from this recital that the case turns largely on the proper application of the statutes regulating traffic construed in the case of **Bloomgreen v Morris, 127 Oh St 147.**

Many errors are assigned. We shall consider first those relating to the special charges.

The court refused to give this special charge, requested by the defendant:—

"When two or more motor vehicles approach an intersection of their paths at the same time or about the same time, the one on the right, if proceeding towards the intersection lawfully, shall have the right-of-way. This means the vehicle on the right has the right to proceed uninterruptedly in a lawful manner in the direction in which it is moving in preference to another vehicle approaching from a different direction into its path."

This charge is a correct statement of the law as announced in Bloomgreen v Morris, supra, was applicable to an issue in the case and should have been given, for the guidance of the jury if the evidence justified the submission to it of the issues raised by the pleading.

The court refused to give this special charge, requested by the defendant:

"The court instructs you that if you find from the evidence that the plaintiff, Alfred Williams, before he crossed the intersection of Superior and Stanley Streets, saw the defendant, Elbert T. Judd, approaching the intersection, and if you find further from the evidence that the defendant Elbert T. Judd was approaching said intersection in a lawful manner at or about the same time Alfred Williams was approaching said intersection, that then and in that event, said

defendant, Elbert T. Judd, had the right to assume that the plaintiff, Alfred Williams, would yield the right-of-way to him and had the right to proceed uninterruptedly across said intersection in the direction in which he was traveling, and if you find from the evidence that the plaintiff, Alfred Williams, failed to yield said right-of-way to said defendant, that then and in that event you must find in favor of the defendant, Elbert T. Judd."

The failure of the plaintiff to yield the right-of-way did not entitle the defendant to a verdict in his favor, regardless of his conduct in crossing, provided he approached in a lawful manner. His conduct while crossing might be a basis for a verdict against him notwithstanding his approach was in a lawful manner. The charge was defective as a statement of the law in excluding this contingency.

The court also refused to give this special charge, requested by defendant:

"The court instructs you that even if you find that the plaintiff, Alfred Williams, entered the intersection a moment or two before the vehicle on the right, that nevertheless it was his duty to yield the right-of-way to the vehicle approaching the intersection at or about the same time from the right, and the court instructs you that if that was the fact, you must nevertheless find in favor of the defendant, if you also find that said defendant approached said intersection from the right in a lawful manner."

This charge also ignores the duty of the defendant to exercise reasonable care while in the act of crossing. Otherwise, the charge is a correct statement of the law. The court did not err in refusing it for the reason stated.

However, the vital issue in this case was raised by the appellant's motion for an instructed verdict. It raised the question of whether there was any substantial evidence of liability to submit to the jury. After reading the evidence carefully, all of which is either quoted or summarized in this opinion, we have reached the conclusion that it must be said that the sole, direct cause of this collision was the failure of the appellee to yield the right of way. He knew the appellant was approaching this intersection within approximately 150 feet, and he did not know how fast he was ap-

454

proaching, but he did know that it was prima facie lawful for him to drive at a rate of thirty-five miles per hour at that place. At that rate, the appellant would have reached the point of collision in less than three seconds. The appellee, traveling at the rate he testified he was going, would not have passed the point of collision in much less than three seconds. This calculation made after the event shows that the appellee must have known that unless he yielded the right of way a collision was imminent. The observations of Judge Jones in Bloomgreen v Morris, supra, at pages 154 and 155 are peculiarly applicable to the situation presented in this case and we quote them:

"Both drivers are presumed to know the law, and we must indulge the presumption that the driver approaching from the left, in this case, Bloomgreen, knew that Morris, if he were lawfully approaching, had the right of way. It therefore became Bloomgreen's duty in approaching the intersection to ascertain whether such lawfully driven vehicle, approaching from his right, would enter the intersection at or near the time he did. Ordinarily the operator of a vehicle is able to ascertain before he reaches the intersection whether another vehicle is approaching from his right; but, in any event, after entering the intersection he has a further leeway of some distance between the point of entering the intersection and its center for ascertaining such approach before he drives into the path of the vehicle possessing the right of way.

"But it is contended that, if the driver who is required to yield the right of way, reaches the intersection first, he has a superior right to proceed, or at least a right to proceed equal to that of the vehicle approaching from his right. There is no such limitation or qualification found in the statute. Furthermore, an adherence to that contention would frequently result in collision where both of the vehicles were equally distant, or nearly so, from the point of intersection. Let us test this contention by its practical application; let us assume that both drivers, traveling in a lawful manner, were approaching the intersection at about the same time and speed; and the vehicle approaching on the left entered the intersection a moment or two before the vehicle on the right, either by increasing its speed or because of having a few feet less to travel than the vehicle having the right of way. The Ohio traffic regulations were designed to avoid those dangers that are inherent in simultaneous approaches by requiring a yielding of the right of way; and they were also designed to prevent careless drivers from crashing highway intersections."

Under the rule announced in **Hamden Lodge v The Ohio Fuel Gas Co., 127 Oh St 469**, it takes more than a scintilla of evidence to require that the issues be submitted to the jury. If there is no substantial evidence, it is the duty of the trial court to sustain a motion for an instructed verdict. In this case, there was no substantial evidence of negligence on the part of the appellant directly causing this collision and the court erred in overruling his motion for an instructed verdict.

However, assuming that there is substantial evidence of defendant's negligence and that it had a direct causal relation to the collision, the appellee's position is not improved because it clearly appears from his own testimony that his negligence directly contributed to the collision. Before he entered the intersection he saw the automobile approaching on his right. At that time it was less than two hundred feet away— probably no more than one hundred and fifty feet away. Knowing this, he proceeded into the intersection and into the path that it would travel and along which it was approaching. Attributing to the appellant the highest speed the evidence suggests— 45 miles per hour—the appellee could have avoided this collision by stopping or changing his speed before entering the appellant's path. He failed to do anything toward avoiding this collision at the time and place when circumspection and care would have availed. Such failure clearly constituted a breach of his statutory duty and his common law duty to exercise reasonable care, and was such contributory negligence as precluded a recovery.

Notwithstanding this, the court in its general charge ignored that issue and instructed the jury that it should return a verdict for the appellee, in the event it found that the appellant was negligent. At no place in the charge did the court instruct the jury as to the effect of contributory negligence upon the right of the plaintiff to recover. These errors undoubtedly had an influence upon the jury in arriving at a verdict for the appellee.

For these reasons, the judgment is reversed and the cause remanded with in-

structions to render final judgment for the appellant.

ROSS, PJ, concurs.